UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 25 CR 654 |
| DEVON HORTON,<br>ANTONIO ROSS,<br>SAMUEL ROSS, and<br>ALFONZO LEWIS | Judge Thomas M. Durkin |

# GOVERNMENT'S *SANTIAGO* PROFFER AND MOTION TO ADMIT EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2)(E)

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: */s/ Emily C.R. Vermylen*
EMILY C.R. VERMYLEN
ELIE ZENNER
MORRIS PASQUAL
Assistant United States Attorneys
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

# TABLE OF CONTENTS


I. INTRODUCTION .... 3

II. GOVERNING LAW .... 4

A. Existence of and Membership in the Conspiracy .... 6

B. "In Furtherance of" the Conspiracy .... 9

C. Alternative Bases for Admissibility of Statements .... 12

1. A Defendant's Own Statements .... 12

2. Adoptive Admissions .... 12

3. Statements for Context .... 13

4. Other Non-Hearsay Statements .... 14

III. EVIDENCE DEMONSTRATING THE EXISTENCE OF THE SCHEME AND THE DEFENDANTS' PARTICIPATION IN THE SCHEME .... 15

A. General Overview of the Scheme .... 15

1. District 65 .... 16

2. Connecting the Dots .... 18

3. Asset Protection .... 19

4. New Flight 35 .... 20

B. Anticipated Witness Testimony .... 21

1. D65 Board Member .... 22

2. D65 CFO .... 23

3. D65 Purchasing Agent .... 25

4. D65 Executive Assistant .... 27

5. D65 Director of Culture and Climate .... 29

6. D56 Elementary Athletic Director .... 30

7. CPS Assistant Principal .... 32

8. D65 Middle School Athletic Director .... 33

9. D65 Warehouse Manager .... 33

10. Individual A .... 34

C. Documentary Evidence .... 35

1. Contracts and Invoices .... 35

a. Connecting the Dots .... 36

b. Asset Protection .... 36

c. New Flight .... 36

2. Emails ........ 37
a. Emails between Horton, Antonio Ross, and D65 Executive Assistant regarding Connecting the Dots' contracts with District 65 ........ 37
b. Emails between Horton, Samuel Ross, and D65 Executive Assistant regarding Asset Protection's contracts with District 65 ........ 38
c. Emails between Horton, Alfonzo Lewis, and D65 Executive Assistant regarding New Flight's contract with District 65 ........ 39
3. Bank Records ........ 40
a. Connecting the Dots ........ 41
b. Asset Protection ........ 42
c. New Flight ........ 42
d. Zelle Payment Memos ........ 43
4. Text Messages Between Horton and Samuel Ross ........ 43
5. Telephone Records ........ 47
6. Cook County Statements of Economic Interest ........ 47
IV. COCONSPIRAOR STATEMENTS ........ 47
V. CONCLUSION ........ 50

The United States of America, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, submits the following proffer of evidence as to the admission at trial of certain coconspirator statements against defendants Devon Horton, Antonio Ross, Samuel Ross, and Alfonzo Lewis, and moves for the admission of such statements pursuant to Federal Rules of Evidence 104(a) and 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I. INTRODUCTION

From approximately June 2020 through June 2023, defendant Devon Horton was employed as superintendent of the Evanston/Skokie School District 65 ("District 65"). Defendants Antonio Ross, Samuel Ross, and Alfonzo Lewis were longtime friends of Horton. During his tenure as superintendent, Horton caused District 65 to award contracts for professional services to limited liability companies wholly owned by his codefendants in exchange for kickback payments totaling over $80,000. The defendants concealed Horton's association with his codefendants and their businesses from District 65's school board, which oversaw contract awards. In addition to the kickback scheme, Horton also used his District 65 credit card for his own personal expenses, including meals, gas, and flowers. Horton evaded paying federal income tax on the kickback payments he received from his codefendants and on his personal expenses that he paid for using his District 65 credit card.

The defendants are charged in a 16-count amended indictment with honest services and money/property wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346. Horton is also charged with embezzlement and theft from a program receiving federal funds, in violation of Title 18, United States Code, Section

666(a)(1)(A), and with evasion of federal income tax, in violation of Title 26, United States Code, Section 7201.

In this submission, the government describes the law governing coconspirator statements, outlines some of its evidence establishing the conspiracy, and sets forth some of the coconspirator statements for which a pretrial ruling by the Court is requested, in accordance with *Santiago*, 582 F.2d at 1130-31, and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

This submission does not detail all of the government's evidence that would establish the existence of the conspiracy or all of the coconspirator statements that were made in furtherance of the charged conspiracy. Rather, this submission highlights for the Court certain of the government's evidence sufficient to establish the existence of the scheme to defraud described in Count One and the participation of the coconspirators. As a result, this submission does not list all of the government's evidence and witnesses, nor does it provide all of the evidence that will be presented by identified witnesses. Finally, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed.

## II. GOVERNING LAW

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government

establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1]

An indictment need not charge a conspiracy for coconspirator statements to be admissible. *United States v. Moon*, 512 F.3d 359, 363 (7th Cir. 2008). That is because the rule of evidence "depends on principles of agency, so it applies . . . whether or not the indictment has a conspiracy count." *Id.*; *see also United States v. Jones*, 754 F. App'x 452, 457 (7th Cir. 2018) (that declarant was not charged in the same indictment with the same conspiracy as the defendant "does not mean that he is not a coconspirator for the purposes of Rule 801(d)(2)(E) of the Federal Rules of Evidence"); *United States v. Rea*, 621 F.3d 595, 604 (7th Cir. 2010) ("[A] prosecutor need not charge a conspiracy to take advantage of Rule 801(d)(2)(E)."); *United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989) ("A charge of criminal conspiracy is not required to invoke the evidentiary rule.").

Defendants are charged in a scheme to defraud. Much like conspiracy, "evidence of one participant's actions in furtherance of a scheme to defraud is admissible against the other participants in that scheme." *United States v. Adeniji*,

[1] No Sixth Amendment confrontation issues arise by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant, because they are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

221 F.3d 1020, 1027 (7th Cir. 2000). Indeed, the Notes of the Committee on the Judiciary for Rule 801 make clear that "[w]hile the rule refers to a coconspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged." *United States v. Shah*, No. 19 CR 864, 2023 WL 22140, at *1 (N.D. Ill. Jan. 3, 2023) (Durkin, J.) (quoting Fed. R. Evid. 801, Notes of Committee on the Judiciary, Senate Report No. 93-1277 (citing *United States v. Spencer*, 415 F.2d 1301, 1304 (7th Cir. 1969)).

### A. Existence of and Membership in the Conspiracy

In accord with *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), this Court must determine whether statements by the defendants' coconspirators will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination, this Court must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." *Id.* at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If this Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: (1) a conspiracy existed; (2) the defendants and declarant were members of the conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also, United States*

*v. Quiroz*, 874 F.3d 562, 570 (7th Cir. 2017); *Alviar*, 573 F.3d at 540. According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid. 801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (*en banc*).

While this Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and the defendants' participation in it, *Bourjaily*, 483 U.S. at 178, 180; *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and a defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be

either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).

There is no requirement, under Rule 801(d)(2)(E), that the government establish all elements of a conspiracy, such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *Gil*, 604 F.2d at 548-50. The government need only establish the existence of a conspiracy for an illegal purpose (or for a legal purpose using illegal means) and participation in the conspiracy by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-50; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more

of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator. *Longstreet,* 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("[I]t is irrelevant when the defendant joined the conspiracy so long as he joined it at some point."). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A coconspirator who has become inactive or less active in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

### B. "In Furtherance of" the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in

order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala,* 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, No. 02 CR 400, 2004 WL 1151630, *2-3 (N.D. Ill. Apr. 28, 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *Alviar*, 573 F.3d at 545 (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

- to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also Johnson*, 200 F.3d at 533;

- to recruit potential coconspirators, *Weiss*, 2025 WL 2476654, at *6; *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), *abrogated on other grounds by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

- to identify other members of the conspiracy and their roles, *Alviar,* 573 F.3d at 545;

- to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

- as an assurance that a coconspirator can be trusted to perform his role, *Sophie*, 900 F.2d at 1073-74; *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

- to inform and update others about the current status of the

conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

- to control damage to an ongoing conspiracy, *Johnson,* 200 F.3d at 533; *United States v. Molinaro,* 877 F.2d 1341, 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

- to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

- to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

- to "describe[e] the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992);

- statements to outsiders "to serve as a salesmanship technique to enhance his position in the eyes of [the outsider] and give confidence about the ability of the organization," *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995); *United States v. Curtis*, 37 F.3d 301, 308 (7th Cir. 1994); and

- statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720, 722 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 F. App'x 925,

926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

### C. Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy or joint venture are independently admissible and do not require a Rule 801(d)(2)(E) analysis.

#### 1. A Defendant's Own Statements

A defendant's own admissions are relevant to establish the factual predicates for the admission of coconspirator statements against him. *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997). A defendant's own admissions are admissible against him pursuant to Rule 801(d)(2)(A), without reliance on the coconspirator-statement rule. *See United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). *See also* Fed. R. Evid. 801(d)(2)(A) (providing that a "statement" is not hearsay if "[t]he statement is offered against a party and . . . was made by the party in an individual or representative capacity"). Additionally, a defendant's own admissions are relevant to establishing the factual predicates for the admission of coconspirator statements against him. *See Godinez*, 110 F.3d at 455; *United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987). For example, here, statements written by the defendants in documents, emails, or text messages are admissible against the defendant who authored the statement.

#### 2. Adoptive Admissions

"A statement of which the party has manifested an adoption or belief in its truth is not hearsay." *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988) (quoting Fed. R. Evid. 801(d)(2)(B)). A party need not expressly state, "I adopt this

person's statements as my own," in order for a statement to be admissible as an adoptive admission. *Id.* Instead, an adoption can occur in the course of a normal conversation when a defendant manifests a belief in the truth of another person's statements. *See United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002) (holding informant's side of telephone conversations with defendant admissible because they were adopted by the defendant during the course of the conversation when the defendant either led or responded to the informant's statements and at no time contradicted the informant's comments or questions).

**3. Statements for Context**

Generally, statements during a conversation with a defendant that are offered by the government to provide context for a defendant's statements are admissible as non-hearsay. For example, in *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011), the Seventh Circuit addressed the district court's introduction of a confidential informant's recorded statements to the defendant. The Court held that the challenged statements were non-hearsay because they were offered not for their truth but to put the defendant's "own words in context and to help the jury make sense out of his reaction to what [the informant] said and did." *Id.* at 580 (defendant's responses "would have been unintelligible without the context provided by [the informant's] statements"); *see also United States v. Schalk*, 515 F.3d 768, 775 (7th Cir. 2008) ("A government informant's statements are not admissible under Rule 801(d)(2)(E) because he cannot be a conspirator; however, they are admissible if they provide context or were adopted by the conspirator during the course of the conversation."); *United States v. Fernandez*, 914 F.3d 1105, 1111 (7th Cir. 2019) (questions were not

hearsay when not offered for their truth, but to "provid[e] the jury with the full context of [defendant's] prior statements"); *United States v. Norton*, 893 F.3d 464, 467 (7th Cir. 2018) (same).

**4. Other Non-Hearsay Statements**

The coconspirator statement rule is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification. Thus, a statement that is incapable of verification—such as a suggestion, question, offer, demand, or order—does not constitute hearsay because it "do[es] not make any truth claims." *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999); *see also United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). This is because a "statement" is defined as "an oral [or] written assertion" or "nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not require Rule 801(d)(2)(E) analysis. *See Tuchow*, 768 F.2d at 868*; see also United States v. White*, 639 F.3d 331, 337-38 (7th Cir. 2011) (bank robbery demand note directing victim to "give me the money in the register" and stating "I have a gun" was a command, not hearsay (cleaned up)).

Finally, the coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not

constitute "hearsay" as defined by Rule 801(c).[2] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the conspiracy. *Gajo*, 290 F.3d at 929-30; *see also United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

As an example, "[s]tatements introduced to show their effect on the listener are not offered to prove the truth of the matter asserted and therefore are not hearsay." *United States v. Graham*, 47 F.4th 561, 567 (7th Cir. 2022) (citations and quotation marks omitted); *United States v. Tinch*, No. 22-1794, 2023 WL 8433515, at *2 (7th Cir. Dec. 5, 2023) (unpublished) ("The trial transcript reflects that the conversations were used to show not the truthfulness of the statements made by Walton and the undercover officer, but rather their effect on Tinch, through his response and reactions.").

## III. EVIDENCE DEMONSTRATING THE EXISTENCE OF THE SCHEME AND THE DEFENDANTS' PARTICIPATION IN THE SCHEME

### A. General Overview of the Scheme

As set forth in more detail below, during Horton's tenure as superintendent of District 65, Horton caused District 65 to award contracts for professional services to businesses wholly owned and operated by his longtime friends, codefendants Antonio

[2] Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

Ross, Samuel Ross, and Alfonzo Lewis. Horton's codefendants paid him kickbacks totaling over $80,000 in exchange for Horton steering District 65 contracts to their businesses. Horton's codefendants falsely certified (with Horton's knowledge) in their companies' contracts with District 65 that Horton did not have a conflict of interest with respect to the awarding of the contracts, concealing their kickback scheme with Horton. Further, Horton and his codefendants caused District 65 to pay false invoices which fraudulently represented that work had been performed on the contracts, when a substantial portion of the work was not performed.

**1. District 65**

From approximately June 2020 through June 2023, Horton was employed as the superintendent of District 65. District 65 serves approximately 7,000 students from kindergarten through eighth grade in Evanston and Skokie, Illinois. As superintendent, Horton was District 65's executive officer responsible for the management of District 65's operations and administration. Specifically, Horton's duties included, among other things, management and supervision of the day-to-day operations of District 65; review and approval of proposals from vendor-companies that sought to provide professional services to District 65; execution of District 65's contracts with vendor-companies that provided professional services to District 65; and review and approval of invoices that vendor-companies submitted for professional services that were provided to District 65.

Horton was employed by District 65's seven-member school board. As part of Horton's application for the position of District 65 superintendent, Horton signed a "Board Policy Manual Acknowledgement" in which he "agree[d] to observe the Board

of Education's policies as outlined in the Policy Manual and as they may be amended from time to time."

District 65's Policy Manual set forth the purchasing and contracting policies employed by District 65, including (a) the superintendent would manage the district's purchases and contracts in accordance with the law and the standards set forth in the District 65 Policy Manual; and (b) every district purchase and contract would "support a recognized District function or purpose as well as provide good quality products and services at a reasonable cost[.]"

The District 65 Policy Manual also set forth the standards of conduct applicable to the District 65 superintendent and other district employees, including (a) no District 65 employee was allowed to act as an "agent" of the district for "the purpose of acquiring profit or personal gain;" (b) no District 65 employee was allowed to solicit or accept "anything of monetary value from contractors, potential contractors, or parties to agreements" with District 65; and (c) the superintendent of District 65 was required to annually file a Statement of Economic Interests form with the Cook County Clerk, which would disclose, among other things, certain income received during the preceding calendar year, as well as the nature and source of such income.

Pursuant to a policy enacted by Horton when he became superintendent, District 65's school board was to receive written notification in advance of board meetings of any contract between the district and a vendor-company that provided professional services to the district if the total value of the contract was valued at

$25,000 or more. As discussed further below, this disclosure was to be made in a document known as the Curriculum Review Document that set forth contracts valued at $25,000 or more and was distributed to the board.

### 2. Connecting the Dots

Defendant Antonio Ross was the sole owner and operator of Connecting the Dots, LLC ("Connecting the Dots"), an Illinois limited liability company which was incorporated on August 3, 2020—approximately two months after Horton became superintendent of District 65. Antonio Ross was also a full-time principal at Hyde Park Academy High School, a Chicago Public School ("CPS"). Horton and Antonio Ross were longtime friends.

While he was superintendent of District 65, Horton selected Connecting the Dots for the award of a professional service contract, contract amendment, and contract extension with District 65. The total amount of Connecting the Dots' contractual awards with District 65 was approximately $139,500. Below are the contracts between Connecting the Dots and District 65:

| Contract Type | Amount | Execution Date | Signatories |
|---|---|---|---|
| Initial Contract | $20,000.00 | 10/27/2021 | Antonio Ross<br>Devon Horton |
| Amendment | $25,000.00 | 4/22/2022 | Antonio Ross<br>Devon Horton |
| Extension | $94,500.000 | 7/14/2022 | Antonio Ross<br>Devon Horton |

Horton approved the invoices that Antonio Ross submitted for payment on Connecting the Dots' contracts with District 65.

Antonio Ross made kickback payments totaling approximately $41,900 to Horton out of the proceeds of District 65's payments to Connecting the Dots. The kickback payments took the form of either cash or Zelle payments directly to Horton, or Zelle payments to Horton's sibling, Individual A, who then transferred the money via Zelle payment to Horton. As explained below, Antonio Ross's kickback payments to Horton occurred within days of when Connecting the Dots received payment from District 65. Horton and Antonio Ross concealed the contracts with Connecting the Dots and the kickback payments on those contracts from District 65's school board.

As set forth in further detail below, multiple District 65 officials and employees in positions to have personal knowledge of the performance of Connecting the Dot's contracts are expected to testify that a number of the deliverables on Connecting the Dots' contracts were either not provided entirely or the work performed on the contracts was negligible.

**3. Asset Protection**

Defendant Samuel Ross—who is not related to defendant Antonio Ross—was the sole owner and operator of Asset Protection Specialist, LLC ("Asset Protection"), an Illinois limited liability company which was incorporated on May 12, 2022. Samuel Ross was a longtime friend of Horton.

During his tenure as superintendent of District 65, Horton selected Asset Protection for the award of two professional services contracts with District 65 in the total amount of approximately $119,500. The scope of work on the contract involved building inventory facility services. Below are the contracts between District 65 and Asset Protection:

| Contract Type | Amount | Execution Date | Signatories |
|---|---|---|---|
| Initial Contract | $34,500.00 | 6/3/2022 | Samuel Ross<br>Devon Horton |
| Second Contract | $85,000.00 | 11/4/2022 | Samuel Ross<br>Devon Horton |

Horton approved the invoices that Samuel Ross submitted for payment on Asset Protection's contracts with District 65.

Samuel Ross made kickback payments totaling approximately $30,800 in cash payments to Horton out of the proceeds of the District 65 payments on the Asset Protection contracts. Horton and Samuel Ross concealed the kickback payments on Asset Protection's contracts from District 65's school board.

Multiple District 65 officials and employees in positions to have personal knowledge of the performance of Asset Protection's contracts are expected to testify at trial that, to their knowledge, a number of the deliverables on Asset Protection's contracts were either not provided entirely or the work performed on the contracts was negligible.

#### 4. New Flight 35

Defendant Alfonzo Lewis was the sole owner and operator of New Flight 35 Sports and Academic Academy ("New Flight"), an Illinois limited liability company which was incorporated on September 27, 2022. Lewis was also the full-time athletic director at Hyde Park Academy High School, where Antonio Ross was the principal. Horton and Lewis were longtime friends.

During his tenure as superintendent of District 65, Horton selected New Flight for the award of a professional service contract with District 65 in the amount of approximately $24,500. The scope of work on the contract involved development of District 65's sporting programs. Horton approved the invoices that Lewis submitted for payment on New Flight's contract with District 65. Below is the contract between District 65 and New Flight:

| Contract Type | Amount | Execution Date | Signatories |
|---|---|---|---|
| Initial Contract | $24,500.00 | 12/16/2022 | Alfonzo Lewis<br>Devon Horton |

Alfonzo Lewis made kickback payments totaling approximately $9,000 in cash payments to Horton out of the proceeds of the District 65 payments on the New Flight contract. These kickback payments were made near in time to when New Flight received payment from District 65. Horton and Alfonzo Lewis concealed the contract with New Flight and the kickback payments on that contract from District 65's school board.

Multiple District 65 officials and employees in positions to have personal knowledge of the performance of New Flight's contracts are expected to testify at trial that, to their knowledge, a number of the deliverables on New Flight's contract were either not provided entirely or the work performed on the contract was negligible.

### B. Anticipated Witness Testimony

The government anticipates that the witnesses called at trial will include the individuals referenced below and others. The testimony of these witnesses will

demonstrate the existence of the scheme and the methods used to engage in the illegal activity, identify the defendants' roles within the scheme, and explain the coschemers' motive and opportunity to engage in the illegal conduct.

**1. D65 Board Member**

D65 Board Member was a member of District 65's school board during Horton's tenure as superintendent and was president of the board for a portion of that period. D65 Board Member is expected to testify that District 65 engaged outside vendors to provide services for the district. D65 Board Member will testify that District 65's school board needed to approve a contract valued at $25,000 or above prior to the district entering into the contract. District 65 employees were prohibited from benefiting financially from contracts between vendors and District 65.

D65 Board Member is expected to testify that during Horton's tenure, D65 Board Member was not aware that District 65 had entered into any contracts, contract amendments, or contract extensions with Connecting the Dots or New Flight. Nor was D65 Board Member aware that Connecting the Dots' owner Antonio Ross and New Flight's owner Alfonzo Lewis were longtime friends of Horton's. D65 Board Member is further expected to testify that while District 65's board approved the award of a contract to Asset Protection in the amount of $34,500, Horton never informed the board that Asset Protection was owned by Horton's longtime friend Samuel Ross.

D65 Board Member is further expected to testify that as superintendent of District 65, Horton was required to complete and submit an annual Cook County Statement of Economic Interests. The purpose of this requirement was to require the

superintendent to disclose any potential conflicts of interest with his work for District 65.

**2. D65 CFO**

D65 CFO was employed as the Chief Financial and Operating Officer of District 65 during Horton's tenure as superintendent. As Chief Financial and Operating Officer, D65 CFO oversaw the process by which District 65 retained vendors to provide professional services. D65 CFO is expected to testify that the process involved the potential vendor's submission of a requestor form and statement of work to a District 65 purchasing agent. D65 CFO would review and approve the issuance of professional services contracts prior to District 65's execution of those contracts. Once D65 CFO had approved the contract, the superintendent would sign and date the contract.

D65 CFO is further expected to testify that during Horton's tenure as superintendent, Horton instituted a "curriculum review process." The stated purpose of that curriculum review process was to provide transparency to the board and the community at large regarding the business of the district, including vendor contracts. As part of this curriculum review process, a document was created called the Curriculum Review Document which disclosed, among other matters, professional services contracts sought to be entered into by District 65 which were valued at $25,000 or more. Similarly, potential contract amendments and extensions of contracts that were valued at $25,000 or more were also disclosed in the Curriculum Review Document, which was distributed to District 65's board members prior to board meetings. D65 CFO is expected to testify that these disclosure requirements

applied equally whether the superintendent or another District 65 employee was the requestor on the contract.

D65 CFO is expected to testify that once a professional services contract was executed, vendors seeking payment on the contract would submit invoices to the District 65 department or division head responsible for overseeing the services on the contract. Invoices would typically include a description of the services provided, the date the services were provided, and the amount of work that was done. Once the invoices were approved, they would be sent to District 65's accounts payable division to process payment.

D65 CFO is expected to testify that with respect to the building inventory facility services outlined in the Asset Protection contract with District 65, those services were not required by District 65 for two main reasons: first, there had not been any issues with inventory control or loss during Horton's tenure as superintendent; and two, District 65 already employed an individual whose responsibilities included the services outlined in Asset Protection's contract.

D65 CFO is expected to testify that invoices submitted on the Asset Protection contract should have been reviewed by the District 65 employee in charge of District 65's buildings and grounds, who would have directly overseen work on the Asset Protection contract. The invoices that were submitted on the Asset Protection contract were deficient in that they failed to specify the hours of work spent performing the different services; the dates the services were performed; and the District 65 employees that Asset Protection interacted with in performing the work.

D65 CFO is expected to testify to his knowledge, Connecting the Dot's contract with District 65 was not disclosed to the board. D65 CFO is expected to testify that Horton informed D65 CFO that he and Antonio Ross were former colleagues at CPS. D65 CFO is expected to testify that the invoices submitted on the Connecting the Dots contract were deficient for reasons similar to the Asset Protection invoices—i.e., the invoices failed to describe the work performed under the contract with sufficient detail. Further, invoices on the Connecting the Dots contracts should have been reviewed by the District 65 head of equity and diversity who was directly overseeing the work on the contract.

D65 CFO is expected to testify that New Flight's contract amount was below the $25,000 threshold for disclosure to the board in the Curriculum Review Document. Because New Flight's contract related to athletics, District 65's athletic directors would have supervised the work on New Flight's contract and should have reviewed invoices on the contract prior to payment. As superintendent, Horton was not involved in the day-to-day operations of District 65's athletics program. D65 CFO is expected to testify that the invoices submitted on the New Flight contract were deficient for reasons similar to the Connecting the Dots and Asset Protection invoices—i.e., the invoices failed to describe the work performed under the contract with sufficient detail.

### 3. D65 Purchasing Agent

D65 Purchasing Agent is expected to testify that D65 Purchasing Agent has been employed as a purchasing agent for District 65 since approximately August

2022. D65 Purchasing Agent's responsibilities in that role include assisting with requisitions, accounting, and purchase orders.

D65 Purchasing Agent is expected to testify regarding District 65's procedure for onboarding new vendors to provide services to the district. Specifically, if a District 65 employee wanted to retain a vendor to provide services to the district, the employee would first complete a District 65 request form which would include the vendor's contact information, a description of the work to be provided, a total amount of the contract, and a budget line explaining where the money to pay the vendor would come from in District 65's budget. The request form would then be submitted to D65 Purchasing Agent for processing. D65 Purchasing Agent would process the request, which included contacting the vendor to obtain certain additional information and sending the vendor District 65's scope of work template.

D65 Purchasing Agent is further expected to testify that the District 65 employee responsible for requesting vendor services was required to disclose the requested contract in the Curriculum Review Document, including the budget line that would be subsidizing the vendor's work.

D65 Purchasing Agent is further expected to testify that the District 65 employee who requested the contract was responsible for reviewing invoices on the contract in the first instance.

D65 Purchasing Agent is expected to testify that District 65's contract with Asset Protection was already executed prior to D65 Purchasing Agent's employment with District 65. D65 Purchasing Agent processed an $85,000 contract amendment

for Asset Protection. Pursuant to District 65's process, the contract amendment should have been disclosed in the Curriculum Review Document, but it was not. Because the request for the contract amendment originated with Horton, it was his responsibility to disclose the contract amendment in the Curriculum Review Document.

D65 Purchasing Agent is expected to testify that she was involved in processing Connecting the Dots' second contract with District 65 in the amount of $94,500, which was over the $25,000 threshold for disclosure to the board. Pursuant to District 65's process, Connecting the Dots' second contract should have been disclosed in the Curriculum Review Document, but it was not. Because the request for the contract originated with Horton, it was his responsibility to disclose the contract in the Curriculum Review Document.

**4. D65 Executive Assistant**

D65 Executive Assistant is expected to testify that D65 Executive Assistant began working for District 65 in 1995. D65 Executive Assistant served as Horton's executive assistant. D65 Executive Assistant's responsibilities included reviewing professional services contracts that were provided to the superintendent's office from the business office. D65 Executive Assistant also reviewed invoices and other documentation submitted to District 65 for payment, and then provided that documentation to Horton for his approval and signature. Horton would either physically sign the contract or instruct D65 Executive Assistant to stamp a contract with his signature.

During Horton's tenure, all professional services contracts were presented to Horton for his review, approval, and signature. Contracts valued at $25,000 and above were required to be disclosed to the board in the Curriculum Review Document.

D65 Executive Assistant is expected to testify that Horton instructed her not to disclose "*his* contracts" in the Curriculum Review Contract. D65 Executive Assistant is expected to testify that she understood "his contracts" to be a reference to certain contract vendors that Horton originated and recommended to District 65. Specifically, D65 Executive Assistant is expected to testify that D65 Executive Assistant had two conversations with Horton regarding a $34,500 contract with Asset Protection and a $85,00 contract with Asset Protection. On both occasions, Horton instructed D65 Executive Assistant not to disclose the contracts in the Curriculum Review Document. D65 Executive Assistant asked Horton whether to disclose a $20,000 contract with Connecting the Dots—despite the fact that the contract was below the $25,000 threshold for disclosure—and Horton instructed D65 Executive Assistant not to disclose that contract. Horton further instructed D65 Executive Assistant not to disclose a $25,000 contract amendment and a subsequent $94,500 contract amendment with Connecting the Dots to the board. Per District 65 policy, both contracts should have been disclosed to the board in the Curriculum Review Document.

With respect to payment on the contracts recommended by Horton, D65 Executive Assistant is expected to testify that those invoices were sent to Horton, D65 Executive Assistant, or the business office. The invoices were either physically signed

by Horton or stamped by D65 Executive Assistant with Horton's signature at Horton's instruction.

**5. D65 Director of Culture and Climate**

D65 Director of Culture and Climate is expected to testify that D65 Director of Culture and Climate has known Horton for approximately 15 years. After Horton became superintendent of District 65, Horton informed D65 Director of Culture and Climate about job openings in the district. In August 2020, D65 Director of Culture and Climate was hired as the Director of Culture and Climate for District 65. D65 Director of Culture and Climate was responsible for providing discipline support to the middle and specialty schools within District 65. D65 Director of Culture and Climate was responsible for the implementation of the Behavior Management Curriculum, which is a student code of conduct setting forth progressive discipline for different violations.

D65 Director of Culture and Climate is expected to testify that he and Horton discussed the need for certain trainings related to the implementation of the Behavior Management Curriculum. Horton later informed D65 Director of Culture and Climate that Horton had hired Antonio Ross's company Connecting the Dots to assist with those training needs. D65 Director of Culture and Climate had previously interacted with Antonio Ross when D65 Director of Culture and Climate was the dean of students at Phillips High School and Antonio Ross was the principal at Hyde Park Academy.

D65 Director of Culture and Climate is expected to testify that Antonio Ross made certain recommendations to D65 Director of Culture and Climate regarding

improving discipline in District 65. D65 Director of Culture and Climate met with Antonio Ross approximately 3-4 times in person to discuss the Behavior Management Curriculum and FACE liaisons, which were certain individuals designated to work on discipline with the parents of troubled students. D65 Director of Culture and Climate also had approximately 5-10 phone calls with Antonio Ross in which they discussed the same subjects. Antonio Ross provided a total of approximately seven to eight trainings to District 65 employees regarding disciplinary issues over a period of approximately eight months.

D65 Director of Culture and Climate is expected to testify that he never reviewed or approved any invoices submitted by Connecting the Dots to District 65. With respect to services that Connecting the Dots invoiced District 65 for, D65 Director of Culture and Climate is unaware of the following services having been provided by Connecting the Dots to District 65:

- Student, staff, or parent surveys, or the results of any such surveys;
- School assessments;
- Final reports

#### 6. D56 Elementary Athletic Director

D65 Elementary Athletic Director is expected to testify that he met Horton in approximately 2010, when D65 Elementary Athletic Director was a student and Horton was a principal. In November 2020, D65 Elementary Athletic Director began work as an administrative assistant at District 65, and later moved to a concierge position at the main District 65 office. D65 Elementary Athletic Director expressed interest to Horton and others in starting an elementary sports program for District

65 and was hired as District 65's Elementary School Athletic Director, a part-time position. D65 Elementary Athletic Director was paid approximately $8,000 to $12,000 for this part-time role.

D65 Elementary Athletic Director is expected to testify that Horton arranged a virtual meeting between D65 Elementary Athletic Director, Horton, and Alfonzo Lewis in approximately December 2022. During the meeting, Horton presented New Flight as a company that was going to assist with evaluating District 65's sports programs, including the elementary and middle school programs. After that initial meeting, Lewis came to approximately 5-8 Saturday basketball games. After those Saturday games, Lewis provided D65 Elementary Athletic Director with comments about coaches and the basketball and cheerleading programs, as well as building and security issues.

D65 Elementary Athletic Director is expected to testify that he never reviewed or approved any invoices submitted by New Flight to District 65. With respect to services invoiced by New Flight, D65 Elementary Athletic Director is expected to testify that to his knowledge, Lewis or New Flight did not provide the following services:

- Conduct any coach or student surveys to gather information regarding sports;
- Prepare reports related to coaches' development or student sporting opportunities for each school within the district;

- Conduct meetings with anyone else in District 65 other than D65 Elementary Athletic Director.

**7. CPS Assistant Principal**

CPS Assistant Principal is the assistant principal at Hyde Park Academy High School, a CPS school. From approximately 2013 until 2023, Antonio Ross was the principal of Hyde Park Academy High School. Alfonzo Lewis is the athletic director at Hyde Park Academy. Antonio Ross introduced CPS Assistant Principal to Horton as his longtime childhood friend. CPS Assistant Principal also knew that Alfonzo Lewis was a longtime friend of Horton and Antonio Ross.

CPS Assistant Principal is expected to testify that CPS Assistant Principal was unaware that Antonio Ross owned a company called Connecting the Dots. CPS Assistant Principal was unaware that Connecting the Dots and Antonio Ross had been hired by District 65 to perform services there. To CPS Assistant Principal's knowledge, Antonio Ross's full-time and primary job was as principal of Hyde Park Academy High School.

CPS Assistant Principal is expected to identify a PowerPoint presentation produced by Connecting the Dots in response to a federal document subpoena as a presentation that CPS Assistant Principal prepared with Antonio Ross for the Hyde Park Academy staff.

CPS Assistant Principal is expected to testify that CPS Assistant Principal was unaware that Alfonzo Lewis owned a company called New Flight, and CPS Assistant Principal was unaware that New Flight and Alfonzo Lewis had been hired by District 65 to perform services there.

**8. D65 Middle School Athletic Director**

D65 Middle School Athletic Director has worked for District 65 for over 30 years. He is currently the principal of Chute Middle School. In addition, D65 Middle School Athletic Director has served as Middle School Athletic Director for District 65 for approximately 19 years. D65 Middle School Athletic Director was responsible for overseeing each local school's athletic department. D65 Middle School Athletic Director was paid a yearly salary of $18,500 and worked over 700 hours per year in that position.

D65 Middle School Athletic Director is expected to testify that he was unaware that New Flight had been retained by District 65 to assist with the district's school sports program. D65 Middle School Athletic Director never met with Lewis or anyone associated with New Flight.

**9. D65 Warehouse Manager**

D65 Warehouse Manager is expected to testify that he was employed by District 65 for approximately 28 years to manage warehouse inventory. D65 Warehouse Manager worked out of District 65's inventory warehouse. D65 Warehouse Manager's responsibilities included regular counts of materials or items stored in District 65's inventory warehouse.

D65 Warehouse Manager is expected to testify that he learned that Samuel Ross had been hired by District 65 to provide inventory services. D65 Warehouse Manager had meetings with Samuel Ross in which Ross reviewed D65 Warehouse Manager's inventory. Samuel Ross was attempting to set up a bar code system for the inventory, and he purchased scanning guns. D65 Warehouse Manager advised

Samuel Ross that he needed to make the scanning guns compatible with District 65's software, but nothing was done. The scanning guns remained at District 65's warehouse untouched and were never used in connection with District 65's inventory process.

D65 Warehouse Manager is expected to testify that with respect to services invoiced by Asset Protection, he is unaware of the following services having been provided:

- Review of CCTVs at the warehouse;
- Review, modification, or support for the warehouse's alarm system or otherwise support the alarm system;
- Labelling of the warehouse;
- Creation of inventory maps;
- Physical inventory of the warehouse.

**10. Individual A**

Individual A is Devon Horton's sibling. Individual A is employed as a teacher with CPS. Individual A has never worked at District 65.

Individual A is expected to testify that Individual A, Horton, Antonio Ross, and Alfonzo Lewis all grew up in the same neighborhood. Individual A has known Antonio Ross for most of Individual A's life. Antonio Ross is a longtime friend of Horton's. Horton and Antonio Ross have known each other for several decades. Individual A has known Alfonzo Lewis since Individual A was a child. Lewis and Horton have known each other for several decades and are longtime friends.

Individual A is expected to testify that Samuel Ross and Horton have been friends for several decades.

Individual A is expected to testify that since at least 2020, Individual A has maintained a Zelle account. In approximately early 2023, Horton called Individual A and stated that one of the "guys" would be sending Individual A a "package." Individual A understood "guys" to be a reference to someone in Horton's close group of friends, including Samuel Ross, Antonio Ross, and Lewis. By "package" Individual A understood Horton to be referencing money. After Individual A received the first payment, Individual A called Horton and asked him what to do with the money. Horton told Individual A to send the money to him. Individual A is expected to testify that in early 2023, Individual A received several Zelle money transfers from Antonio Ross and Alfonzo Lewis. Individual A promptly transferred those amounts to Horton's Zelle account. Individual A did not know what the money was for.

### C. Documentary Evidence

The government anticipates introducing documentary evidence that corroborates the existence of the scheme and the members' participation in the scheme.

#### 1. Contracts and Invoices

The government will present contracts and invoices associated with Connecting the Dots, Asset Protection, and New Flight. Each of Antonio Ross, Samuel Ross, and Alfonzo Lewis falsely certified in their business's contracts with District 65 that they had no conflict of interest with their performance of obligations under the contract, as follows:

> **<u>Conflict of Interest</u>**. The consultant represents and certifies that, to the best of its knowledge, (1) no School District employee or agent is interested in the business of the Consultant or this Agreement; (2) as of the date of this Agreement, the Consultant does not have any interest that would conflict in any manner or degree with the performance of the obligations under this Agreement; and (3) neither the Consultant nor any person employed by or associated with the Consultant shall at any time during the term of this Agreement obtain or acquire any interest that would conflict in any manner or degree with the performance of the obligations under this Agreement.

#### a. Connecting the Dots

The government will present the contracts between Connecting the Dots and District 65, in addition to a total of thirteen invoices that were approved by Horton and paid by District 65 on the contracts. The invoices were received by D65 Executive Assistant, Horton's executive assistant, and signed "ok to pay" by Horton.

#### b. Asset Protection

The government will present the two contracts between Asset Protection and District 65, as well as a total of seven invoices that were approved by Horton and paid by District 65 on the two contracts. The invoices were received by D65 Executive Assistant, Horton's executive assistant, and signed "ok to pay" by Horton.

#### c. New Flight

The government will present the contract between New Flight and District 65, in addition to three invoices that were approved by Horton and paid by District 65 on the contract. The invoices were received by D65 Executive Assistant, Horton's executive assistant, and signed "ok to pay" by Horton.

### 2. Emails

The government intends to present email correspondence between the defendants and other District 65 employes regarding contracts and invoicing for Connecting the Dots, Asset Protection, and New Flight. This email correspondence reflects that Horton recommended the contracts with Connecting the Dots, Asset Protection, and New Flight for approval by District 65 and that the invoices on the contracts were sent to Horton for payment.

#### a. Emails between Horton, Antonio Ross, and D65 Executive Assistant regarding Connecting the Dots' contracts with District 65

On September 9, 2021, Horton emailed Antonio Ross regarding Connecting the Dots' initial contract with District 65. Horton wrote, "Hey Ross, here is our BRC, take a look at it and get that contract ready." Antonio Ross responded on September 12, 2021, "Take a look at the contract and let me know if we need to make adjustments." Antonio Ross attached a proposed contract to his email to Horton. On September 14, 2021, Horton forwarded Antonio Ross's email attaching a proposed contract to D65 Director of Culture and Climate, D65 Executive Assistant, and another District 65 employee, writing, "Please see the contract that is attached. Maria, we need to get Connect the Dots approved as a vendor and get the contract finalized. Please use my budget to get this done."

On April 19, 2022, Antonio Ross emailed Horton regarding Connecting the Dots' contract amendment. Antonio Ross wrote to Horton, "I have attached an amendment to the existing contract for the additional scope of work." Horton

forwarded Ross's email to D65 Executive Assistant, instructing her to "please work to get this amendment taken care of. Use ESSR III funds."[3]

On June 30, 2022, Antonio Ross emailed Horton regarding Connecting the Dots' contract extension with District 65. Antonio Ross wrote to Horton, "I have attached the scope of work for the School Connectedness and Relationship building training for support staff members in your school district." Horton forwarded Antonio Ross's email and scope of work on the proposed contract extension to D65 Executive Assistant.

On November 30, 2022, Antonio Ross emailed D65 Executive Assistant "the invoice for the Relationship Building program for the month of November." March 29, 2022, Antonio Ross emailed D65 Executive Assistant "the final invoice from Connection [sic] the Dots."

**b. Emails between Horton, Samuel Ross, and D65 Executive Assistant regarding Asset Protection's contracts with District 65**

On May 27, 2022, Samuel Ross emailed Horton a scope of work for Asset Protection's initial contract with District 65, writing, "Here is the scope of work that we discussed.... After completing the facility evaluation, we will provide an in-depth report with an executive summary that includes observations and specific recommendations for your facility. We will also assist with implementing a strategy to put ideas into action." Horton forwarded Samuel Ross's email to a District 65

[3] "ESSR III Funds" were federal pandemic stimulus funds for educational institutions.

employee, writing, "Can you please stop by to see me. I know Cheryl is out and would like to get some support with getting this contract going."

On October 6, 2022, Samuel Ross emailed Horton a proposed statement of work for a second contract with District 65 (which Horton referred to as an "amendment"). Horton forwarded Samuel Ross's email to Mireya Dominguez and Tierre Brunson, District 65 employees, and D65 Executive Assistant, writing, "We are diving into part two of our warehouse audit with some solutions. Asset protection needs to do an amendment. Can you please provide them with the proper documentation? It will come out of the maintenance budget. Last time we used ESSR III. Brunson make sure this is completed before we shift."

On August 19, 2022, Samuel Ross emailed an invoice to Horton, writing, "Please see attached invoice for phase two of the D65 facility assessment." Horton forwarded the invoice to D65 Executive Assistant, writing, "Hello Maria, please see the invoice to be paid for Asset Protection."

On June 8, 2022, June 21, 2022, December 6, 2022 and June 2, 2023, Samuel Ross emailed invoices for Asset Protection to either D65 Executive Assistant or Horton. On April 17, 2023, Samuel Ross emailed Terrance Little, a District 65 employee, an "attached invoice for the purchase of the warehouse scanners we discussed via Zoom with Dr Horton."

**c. Emails between Horton, Alfonzo Lewis, and D65 Executive Assistant regarding New Flight's contract with District 65**

On November 5, 2022, Lewis emailed Horton a proposal for New Flight's contract with District 65, writing, "We are very pleased that Evanston/Skokie 65 have

giving [sic] us at New Flight 35 Sports & Academic Academy to service your district. Please find a copy of our current proposal for service attached. If you have any question please feel free to contact us back."

On December 13, 2022, Lewis emailed a $7,500 invoice to D65 Executive Assistant, copying Horton, writing "Please see attachment for updated Invoice for New Flight 35." On December 16, 2022, D65 Executive Assistant emailed Lewis, copying Horton, and attaching "a copy of your direct deposit payment." On February 3, 2023, Lewis emailed D65 Executive Assistant and D65 Purchasing Agent an $8,500 invoice.

**3. Bank Records**

The government will present evidence of Antonio Ross, Samuel Ross, and Alfonzo Lewis's kickback payments to Horton. The kickback payments took three forms: (1) cash payments directly to Horton; (2) Zelle payments to Horton; and (3) Zelle payments to Horton's sibling, Individual A. Horton deposited many of the cash kickback payments on the same day that his codefendants converted District 65's payments to their businesses to cash.

The government has obtained bank records for each of the four defendants, as well as bank records for Asset Protection, Connecting the Dots, and New Flight. These bank records reflect a total of at least $81,700 in kickback payments to Horton across all three businesses. The government will present summary charts that demonstrate that the kickback payments were made close in time to District 65's payments to Asset Protection, Connecting the Dots, and New Flight. Below is a summary of the kickbacks that Horton received from his codefendants; this summary

does not include each and every one of the kickbacks that the government may present at trial.

**a. Connecting the Dots**

Antonio Ross made at least $41,900 in kickback payments to Horton from District 65 payments to Connecting the Dots. The kickback payments are shown in the charts below:

**Antonio Ross Cash Kickbacks to Horton**

| D65 Payment and Date | Antonio Ross Money Movements | Devon Horton Money Movements |
|---|---|---|
| $25,000 (5/21/22) | $10,300 cash withdrawal (5/21/22) | $9,900 in cash deposits (three separate deposits on 5/21/22) |
| $10,500 (4/14/23) | $4,100 cash withdrawal (4/22/23) | $4,000 cash deposit (4/23/22) |

**Antonio Ross Zelle Kickbacks Directly to Horton's Zelle Account**

| D65 Payment and Date | Antonio Ross Zelle Kicback to Horton |
|---|---|
| $10,500 (9/21/22) | $2,000 (9/27/22)<br><br>$2,000 (9/28/22) |
| $10,500 (10/13/22) | $2,000 (10/18/22)<br>$2,000 (10/19/22) |
| $10,500 (12/15/22) | $4,000 (12/23/22) |
| $10,500 (1/12/23) | $4,000 (1/18/23) |
| $10,500 (2/14/23) | $4,000 (2/21/23) |

**Antonio Ross Zelle Kickbacks Through Individual A's Zelle Account**

| D65 Payment and Date | Antonio Ross Zelle to Individual A | Individual A Zelle to Horton |
|---|---|---|
| $10,500 (3/30/23) | $2,000 (4/1/23)<br>$2,000 (4/2/23) | $2,000 (4/1/23)<br>$2,000 (4/2/23) |

| | | |
|---|---|---|
| $10,500 (5/15/23) | $2,000 (5/13/23)<br>$2,000 (5/14/23) | $2,000 (5/13/23)<br>$2,000 (5/14/23) |

**b. Asset Protection**

Samuel Ross made at least $30,800 in cash kickback payments to Horton from District 65 payments to Asset Protection. As reflected in the chart below, after receiving payment from District 65, Samuel Ross withdrew large cash deposits form his bank account (the same account to which District 65 made payment on Asset Protection's contract). Near in time to Samuel Ross's cash withdrawals, Horton deposited large sums of cash into his personal bank accounts.

**Samuel Ross Cash Kickbacks to Horton**

| D65 Payment and Date | Samuel Ross Cash Withdrawals and Dates | Horton Cash Deposits and Dates |
|---|---|---|
| $17,250 (6/30/22) | $9,000 (7/6/22) | $5,000 (7/6/22)<br>$2,900 (7/6/22) |
| $17,250 (8/30/22) | $10,000 (8/30/22) | $5,000 (8/31/22) |
| $14,000 (11/15/22) | $7,000 (11/23/22) | $3,000 (11/23/22)<br>$3,000 (11/23/22) |
| $20,000 (2/15/23) | $4,500 (2/28/23)<br>$3,500 (3/21/23) | $3,500 (3/22/23) |
| $20,000 (5/15/23) | $8,000 (5/20/23) | $2,500 (5/21/23)<br>$3,550 (5/21/23)<br>$2,350 (5/21/23) |

**c. New Flight**

Alfonzo Lewis made at least $9,000 in kickback payments to Horton from District 65 payments to New Flight. The kickback payments are reflected in the charts below.

**<u>Lewis Zelle Kickback Directly to Horton's Zelle Account</u>**

| D65 Payment and Date | Lewis Zelle Kicback to Horton |
|---|---|
| $8,500 (2/15/23) | $3,000 (2/21/23) |

**<u>Lewis Zelle Kickbacks to Horton Through Individual A's Zelle Account</u>**

| D65 Payment and Date | Lewis Zelle to Individual A | Individual A Zelle to Horton |
|---|---|---|
| $8,500 (2/15/23) | $2,000 (3/29/23) | $2,000 (3/29/23) |
| $8,000 (5/15/23) | $3,500 (5/16/23)<br>$500 (5/22/23) | $3,500 (5/16/23)<br>$500 (5/24/23) |

#### d. Zelle Payment Memos

The government anticipates introducing certain statements by Antonio Ross and Alfonzo Lewis in the "payment memo" of their Zelle transfers to Individual A, as follows:

- On March 29, 2023, Lewis sent Individual A a Zelle transfer in the amount of $2,000. The "payment memo" associated with the transfer stated, "Thanks for all your help."
- On May 16, 2023, Alfonzo Lewis sent Individual A s a Zelle transfer in the amount of $3,500. The payment memo stated, "Happy Birthday my brother."

### 4. Text Messages Between Horton and Samuel Ross

The government obtained text messages between Horton and Samuel Ross that were produced by Asset Protection in response to a grand jury subpoena for records. These messages, certain of which are reproduced below, reflect that Horton was the driving force behind obtaining District 65 approval for Asset Protection's

contracts and securing payment on Asset Protection's invoices. In certain of the messages, Horton dictates to Samuel Ross the contract amount and invoice dates to use in the contracts and invoices that Samuel Ross submits to District 65.

Specifically, from May 26-28, 2022, Horton and Samuel Ross exchanged the following text messages regarding Asset Protection's work with District 65:

| | |
|---|---|
| Horton: | Yo kid you got everything together yet[?] |
| Samuel Ross: | Yes. I can sign now |
| Horton: | Ok now send it to me at my work email: Hortond@district65.net[.] I'm[in] your email please write the following:<br>Hello Dr. Horton,<br>Here is the scope of work that we discussed.<br>Attach your contract and send everything over: Contract, scope of work and Insurance. |
| Samuel Ross: | Ok. I'll send that tonight. |
| Horton: | Got your email. I do[n']t see the scope of work. Should include the actual work, timeline, cost. |
| Samuel Ross: | Gotcha |
| Horton: | Make the cost for 35k [$35,000] |
| Samuel Ross: | Thank you |
| Samuel Ross: | I'm unhappy with some of my verbiage. I will change a few things. |
| Horton: | Ok I'll check it out. |
| Horton: | What's up kid the SOW is cool just change the dates to month of June 2022 and make the cost [$]34,500.00<br>We will do another in the new school year for the work. Our fiscal year starts July 1st to July 1st |
| Samuel Ross: | Remove the deliverables? |
| Horton: | Yes good catch make it all about the assessment. |
| Samuel Ross: | Ok. Done<br>Send you via email or to Brunson?<br>Or just cc to you? |
| Horton: | Send it to both |
| Samuel Ross: | Consider it done.' |

From June 7-9, 2022, Horton and Samuel Ross exchanged the following text messages regarding Asset Protection's invoicing to District 65:

| | |
|---|---|
| Horton: | Make it for like 7 days. |
| Samuel Ross: | Okay |
| Horton: | No one is checking. 5 on sight and 2 for paperwork |
| Horton: | Hey Jigg the invoice is good.<br>Please email me and my assistant [D65 Executive Assistant].<br>[D65 Executive Assistant's email address]<br>Hortond@district65.net<br>Last thing change the dates to June 6th, 7th, 8th, 9th, 10th |
| Samuel Ross: | Done |
| Horton: | Hey I'm going to call you so you can chat with my CFO. He will tell you how to write up your invoice. |
| Samuel Ross: | Now ? Ok |
| Horton: | I'm[in] about an hour |
| Samuel Ross: | Ok |

On June 21, 2022, Horton and Samuel Ross exchanged the following text messages regarding Asset Protection's invoicing to District 65:

| | |
|---|---|
| Horton: | Hey kid let's get the invoice in pronto. They are pushing them in and out fast! |
| Samuel Ross: | Ok. Submit another Invoice for half ? Or submit the partial assessment |
| Horton: | Half<br>See look at this invoice [laughing with tears emoji] |
| Samuel Ross: | Jesus. Gotcha<br>Just landed in Austin. I'll knock out the invoice once I get to the store |
| Horton: | Bet! |

On August 25, 2022, Horton and Samuel Ross exchanged the following text messages regarding Asset Protection's contract with District 65:

| | |
|---|---|
| Horton: | It's funny sitting here in my daily debrief with my team and they are referencing the work that you are doing [fist bump emoji] |
| Samuel Ross: | Lol<br>It's mind blowing how perfect this is |
| Horton: | I'm telling you it's a much needed service. [glasses clinking emoji] |
| Samuel Ross: | Cheers [glasses clinking emoji] |

On November 10-15, 2022, Horton and Samuel Ross exchanged the following text messages:

| | |
|---|---|
| Samuel Ross: | Any updates? I had to pause the vendor order until I hear back from the District |
| Horton: | All good sir! Should drop Monday or Tuesday [fist bump emoji] |
| Samuel Ross: | [fist bump emoji] |
| Horton: | Yo you should be good today sir. |
| Samuel Ross: | I just checked. Yessir |
| Horton: | Man this that good life not hood life yo [emoji] |
| Samuel Ross: | [laughing with tears emoji] |

From December 5-6, 2022, Horton and Samuel Ross exchanged the following text messages regarding Asset Protection's invoicing to District 65:

| | |
|---|---|
| Horton: | Gm[good morning] sir, get your invoice in to me and Maria today. It's a short month. |
| Samuel Ross: | Good morning<br>Will do! …. |
| Samuel Ross: | Good morning,<br>Invoice sent this morning |
| Horton: | Gm[good morning], Jigg you got 20k at the top of your invoice and 14k at the bottom. Please correct it and resend. |
| Samuel Ross: | Damn<br>I don't know why I purchased a MacBook |
| Horton: | I'm a Mac guy myself. You got a ton going on kid. It's all good. |

From January 9-10, 2023, Horton and Samuel Ross exchanged the following text messages regarding Asset Protection's invoicing to District 65:

| | |
|---|---|
| Horton: | What's up kid? Don't forget to do your invoice. |
| Samuel Ross: | What up Kid!<br>I'm in Vegas this week. I'm going to visit the warehouse and complete some work before to submitting. |
| Horton: | Ok just know that the timeline for submission is this week. So the payout will probably be next month. I agree with getting some work done is important |

#### 5. Telephone Records

The government anticipates introducing phone records for all four defendants which reflect that the defendants communicated in and around the times that Horton received kickback payments from his codefendants.

#### 6. Cook County Statements of Economic Interest

The government anticipates introducing Statements of Economic Interest that Horton filed with the Cook County Clerk during his employment as District 65 superintendent. Horton was required to disclose "the source of any income in excess of $7,500" in those statements, but he failed to disclose the kickback payments that he received from his codefendants. Similarly, Horton was required to disclose "a gift or gifts … valued singly or in the aggregate in excess of $500," and again, did not disclose the kickback payments that he received from his codefendants.

## IV. COCONSPIRAOR STATEMENTS

The statements between the coconspirators in furtherance of the conspiracy fall into numerous categories, all concerning subjects integral to the conspiracy and its success. These statements—which will establish the information flow between coconspirators and show how each performed his role—will be introduced through the testimony of witnesses, including those noted above, written communications made by coconspirators, such as email and text messages (some of which are described herein) and contracts and invoices, such as Connecting the Dots, Asset Protection, and New Flight's contracts with District 65 and the invoices submitted pursuant to those contracts. As outlined in the opening section of this proffer, many of these statements will be admissible without regard to the coconspirator hearsay

rule, because they are statements of the defendants, statements not offered to prove the truth of the matter asserted, verbal acts, or for other reasons.

The government has not detailed each and every proposed coconspirator statement of each witness or document. Nor does *Santiago* or the Seventh Circuit's precedent require the government to set forth each specific, verbatim coconspirator statements. Instead, the Seventh Circuit has specifically stated that categories of statements, such as those set forth below, suffice. *See Alviar*, 573 F.3d at 540 (rejecting defendant's argument that the *Santiago* proffer was inadequate where the Santiago proffer "contained a preview of the evidence as to all defendants," summarized anticipated cooperator testimony, and summarized recorded calls); *United States v. McClellan*, 165 F.3d 535, 554 (7th Cir. 1999) (rejecting the argument that the "government is bound to give notice in advance of trial of co-conspirator statements it intends to introduce at trial"); *United States v. Johnson*, No. 08 CR 466, 2011 WL 809194, at *8 (N.D. Ill. Mar. 2, 2011) (rejecting defendant's argument that the government failed to "specifically identif[y] the statements it intends to introduce" and rejecting defendant's request "that the Government be required to specifically identify each statement by a co-conspirator it intends to introduce").

Nevertheless, the government has provided specific examples of coconspirator statements here in this proffer. Based on this thorough and detailed filing, the defendants are clearly on notice of the coconspirator statements at issue. The coconspirator statements offered at trial will concern the subjects listed below, and include, but are not limited to, the coconspirator statements discussed above:

1. Invoices submitted by Connecting the Dots, Asset Protection, and New Flight to District 65 seeking payments on their respective contracts;

2. Horton's statements to D65 Director of Culture and Climate that Horton had hired Antonio Ross and Connecting the Dots to assist with implementation of the Behavior Management Curriculum;

3. Horton's statements to D65 Elementary Athletic Director that Horton had selected New Flight to assist with evaluating District 65's sports programs, including the elementary and middle school programs;

4. Horton's instructions to D65 Executive Assistant to not disclose contracts or contract amendments for Asset Protection and Connecting the Dots in the Curriculum Review Document that was sent to the District 65 school board;

5. Horton's instructions to D65 Executive Assistant and other District 65 employees to initiate the vendor approval and contracting approval process for Asset Protection, Connecting the Dots, and New Flight;

6. Horton's instructions to D65 Executive Assistant and other District 65 employees to pay invoices submitted by Connecting the Dots, Asset Protection, and New Flight;

7. Horton's statements to Individual A that one of the "guys" would be sending Individual A a "package," and Horton's instructions to Individual A to transfer Zelle payments from Antonio Ross and Alfonzo Lewis to Horton;

8. Antonio Ross and Alfonzo Lewis's statements on the pay memo lines of their Zelle transfers to Individual A; and

9. Statements regarding efforts to conceal the kickback scheme and the conspirators' participation in that scheme.

As is evident from the description of these categories, all such statements made by coconspirators furthered the conspiracy. Thus, under the case law summarized above, all such statements are properly admitted at trial as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E).

## V. CONCLUSION

The above is an outline of the evidence that the government will introduce to establish that the charged conspiracy existed. Based upon this proffer, the government respectfully requests that this Court find that categories of coconspirator statements listed above, as well as similar coconspirator statements, are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted,

By: */s/ Emily C.R. Vermylen*

EMILY C.R. VERMYLEN
ELIE ZENNER
MORRIS PASQUAL
Assistant United States Attorneys
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 353-5300